UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Ayla Royan,

    *Plaintiff,*

v.

Chicago State University, et al.

    *Defendants.*

No. 20 CV 2014

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

    Ayla Royan ("Royan") was less than a year's worth of credits away from obtaining her Doctor of Pharmacy degree from Chicago State University ("CSU") when she was expelled. CSU argues Royan's dismissal was for poor academic performance; Royan contends it was because of her disability. Royan sued CSU for violating the Rehabilitation Act ("Rehab Act") and Americans with Disabilities Act ("ADA"). She also sued CSU's former dean, Elmer Gentry (collectively "Defendants"), for violating her due process rights under 42 U.S.C. § 1983 for his slow adjudication of her appeal. Defendants have moved for summary judgment on all counts. For the following reasons, the motion is granted.

## I.  Local Rule 56.1

    "On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Each statement of fact must

be "concise."[1] L.R. 56.1(d)(1). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

A party responding to an adversary's statement of fact may make objections based on admissibility, with the argument for the propriety of the objection in its brief. L.R. 56.1(e)(2) ("If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief.") If the Court overrules the objection and the party does not otherwise dispute the fact, however, the fact is deemed admitted. *Id.* "To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017).

Defendants object to at least 23 of Royan's 36 facts with responses that are deficient in one way or another. For example, Defendants frequently respond with

---

[1] Defendants argue Royan failed to be concise by including multiple "facts" per paragraph (thereby adding more facts than permitted by rule). The Court agrees many of Royan's paragraphs contain narrative descriptions that take concision to its breaking point. Still, "[t]here is no categorical prohibition of paragraphs containing multiple sentences or multiple facts." *Jackson v. City of Chicago*, 2024 WL 1142015, at *2 n.1 (Mar. 15, 2024). The Court will therefore consider all Royan's facts, albeit with some hesitation.

naked assertions that the fact asserted by Royan constitutes inadmissible hearsay[2] or is inadmissible on relevance grounds, with no elaboration or analysis whatsoever, including in their reply brief. [Dkt. 134 at 6-7.][3] Because Defendants' have not supplied the required supporting argument in their brief, these objections are waived. *See Ross v. Fin. Asset Mgmt. Sys., Inc.*, 74 F.4th 429, 434 (7th Cir. 2023). Certain facts are also deemed admitted to the extent Defendants failed to provide alternative bases to dispute them.

## II. Background

The following facts are taken from the parties' Local Rule 56.1 statements and supporting exhibits. [Dkts. 121, 127, 129, 135.] The Court presents the facts in the light most favorable to Plaintiff. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). These facts are undisputed except where a dispute is noted.

### A. Program Policies and Requirements

CSU is a public institution of higher learning that receives state funding. [Dkt. 129 ¶ 1.] CSU operates a College of Pharmacy (the "Program") that offers four-year pharmacy degrees. [*Id.* ¶ 2.] While the first three years of the Program are dedicated to lectures and practicums, students in their fourth year must complete pharmacy practice experiences or advanced pharmacy practice experiences known as "rotations." [*Id.*] The purpose of rotations is to give students practical pharmacy

---

[2]    Many of the hearsay objections are based on statements made by CSU agents or employees, rendering them non-hearsay. Fed. R. Evid. 801(d)(2)(D).
[3]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

experiences while learning from professionals in the field. [*Id.*] Students must successfully complete their rotations with a passing grade to graduate. [*Id.*]

The Program has a student handbook which outlines its policies on academic probation. This includes how and when a student is placed on academic probation, the remedial requirements for those students, and potential consequences for students who fail to comply with those requirements. [*Id.* ¶ 5.] Relevant here, a student is placed on probation when they fail a course. [*Id.*] When that occurs, the student is notified in writing that "continued inadequate academic performance may result in dismissal from the College." [*Id.*] The Program's Academic Standing Committee (the "Committee") then decides what actions the student must take to return to good academic standing. [*Id.*] The Committee may also determine the student should be dismissed from the Program. [*Id.*]

Students may appeal the Committee's decision to the Program's dean. [*Id.* ¶ 6.] The appeal must be in writing, explain the reasons the student believes the Committee erred, and state the relief the student seeks. [*Id.*] The dean must notify the student of their decision, which is final. [*Id.*]

**B.      Royan's History in the Program**

Royan began her studies at CSU in the fall of 2014. [*Id.* ¶ 8.] Two years later, Royan informed Program personnel that she had been diagnosed with clinical depression and an eating disorder. [*Id.* ¶ 12.] Royan requested and received additional time to complete assignments and take exams during the fall 2016 and spring 2017 semesters based on these conditions. [*Id.* ¶ 13.] Royan's symptoms worsened in the fall of 2017, and she sought and received a medical leave of absence

4

from the Program, which lasted from August 2017 until her doctor cleared her to return to school in September 2018. [*Id.* ¶¶ 14-15.] Royan typically received "B" and "C" grades in her coursework, with the occasional "A." [Dkt. 127-6 at 1.]

By the spring 2019 semester, Royan had advanced far enough in the Program to participate in rotations. One of those was a six-week rotation scheduled with Dr. Shivani Patel from University of Chicago Medicine, set to run from February 11, 2019, through March 22, 2019. [*Id.* ¶¶ 16-17.] This rotation is the first in a series of events that ended with Royan's dismissal from the Program.

### C.    Rotation with Dr. Patel

The rotation got off to an uneventful start. Royan spent the first week in the rotation entering data for Dr. Patel's personal research, as opposed to doing substantive course work. [Dkt. 135 ¶ 3.][4] During these first few days, Royan also informed Dr. Patel that she had a gynecological condition which caused her to sweat, look pale, and move slowly. [*Id.* ¶ 6.] A week later, Dr. Patel received an email from Dr. Bishop, a Program administrator, who was checking in to confirm Royan was meeting course standards, and to remind Dr. Patel that Royan's mid-rotation evaluation was due on March 1. [*Id.* ¶ 4.] Dr. Patel did not alert Dr. Bishop to any concerns she had with Royan's performance. [*Id.*]

---

[4]    This is a prime example of Defendants' inappropriate hearsay objection. Royan supports her contention with citations to her own deposition where she testified to her personal experience during the rotation, but Defendants inexplicably characterize this as inadmissible hearsay. Deposition testimony based on personal knowledge is "perfectly admissible evidence through which a party" may attempt to present her side of the story at summary judgment. See *Hill v. Tangherlini*, 724 F.3d 965, 967-68 (7th Cir. 2013).

Dr. Patel had criticized Royan on at least three occasions by this point, however. More specifically, she complained that Royan was unable to find a guideline for an illness (which Royan claims did not exist), admonished Royan for failing to abide by HIPAA requirements, and critiqued Royan for her performance in a mock patient consultation. [*Id.* ¶ 5.] Royan viewed these as minor incidents.

The rotation's inflection point came on the morning of March 6, when Dr. Patel and Royan had an in-person meeting to discuss Royan's performance.[5] Dr. Patel wanted to meet a day earlier, but Royan already had an appointment with her psychiatrist. [*Id.* ¶ 8.] Royan learned at this appointment she would need to find a new psychiatrist who specialized in eating disorders, which upset Royan. [*Id.*] Still processing this information, Royan arrived at the rotation on March 6 in tears. Dr. Patel noticed that Royan was emotional and asked how she was doing. Royan confided in Dr. Patel about her diagnoses, hospitalizations, and the recent update regarding the forthcoming change in psychiatrists. [*Id.*]

The parties disagree on what happened next. According to Royan, Dr. Patel did not take the news well. Royan avers Dr. Patel responded by telling Royan "she was too sick to be here"; that she felt "responsible for you because of your illness, [and responsible] if you hurt yourself"; that "you're not good enough, you're not capable of being a pharmacist"; and that she would fail Royan in the rotation because Royan was "too sick … to work as a pharmacy student." [*Id.* ¶ 9.] Dr. Patel also criticized

---

[5] Despite Dr. Bishop's reminder that evaluations were due on March 1, Dr. Patel had not submitted hers by March 6, and would not formally submit her evaluation of Royan until March 11, 2019. [Dkt. 129 ¶ 19.]

Royan for being sweaty and slow; told Royan she should be a pharmacy technician as opposed to a Doctor of Pharmacy; and told Royan she needed to take a break from her course work to address her diagnoses. [*Id.* ¶ 10.] Dr. Patel repeated multiple times she was concerned Royan would hurt herself, and Dr. Patel would be held responsible if something happened. [*Id.* ¶ 11.] Royan was shocked and distraught by Dr. Patel's statements.

Dr. Patel and CSU tell a much different story. According to them, the focal point of the conversation was Royan's subpar performance in the rotation, not her medical conditions. [Dkt. 129 ¶ 21.] Dr. Patel claims her mid-rotation evaluation for Royan (not formally submitted until March 11) summarized their meeting. Dr. Patel told Royan she "has deficits in her clinical knowledge and patient care interactions", she "has a lot of work ahead of her", and she "has not demonstrated readiness and ability to fully conduct patient counseling independently." [Dkt. 121-5 at 3.] Dr. Patel noted Royan "was very tearful and did not demonstrate the capacity to proceed with [the] rotation and the ability to take on the rigor required to successfully learn the foundations of ambulatory care." [*Id.*] But Royan told Dr. Patel she "did wish to proceed with the rotation and expressed her desire to improve." [*Id.*]

The parties agree that shortly after the meeting concluded, Dr. Patel emailed Rachel Prusi, the director of experiential education at the University of Chicago, to discuss Royan, whom Dr. Patel described as "a very special CSU student." [Dkt. 135 ¶ 12.] The two met that same day, and Prusi then contacted Dr. Charisse Johnson (Assistant Dean) and Dr. Elsa Bishop (Contract Pharmacist) from the Program to

discuss "an urgent concern" about Royan. [Dkt. 129 ¶ 23.] The discussion took place the next day, March 7.

In a follow-up email summarizing their conversation, Dr. Patel told Dr. Johnson she is "very concerned for [Royan's] well-being at the current state" and Royan "does not have the necessary skill set to be at the level of training she is currently at, nor the ability to absorb and learn at this time (due to circumstances that are irrelevant) in order to proceed." [Dkt. 127-18 at 1.] Dr. Patel also noted she advised Royan of various options she believed would help Royan address her medical issues—including an employee assistance program, medical leave, or some other solution with CSU's input—but Royan was not interested. [Id.]

Dr. Patel's March 7 email elaborated on her assessment of Royan's performance in the rotation: "objectively, Ayla [Royan] is not meeting the expectations of this rotation as a … 4th year pharmacy student." [Id.] While Dr. Patel noted that earlier in the day Royan "did a good job" with an assignment, "she is not progressing at the rate that she should be progressing to meet expectations." [Id.] Dr. Patel provided an anecdote where Royan included lethal dosing amounts on a drug chart and was then unable to explain why she listed that amount.[6] [Id.] More generally, Dr. Patel noted Royan required significantly more oversight and had less clinical knowledge than other students. [Id.]

Dr. Johnson responded to Dr. Patel by stating she was working with CSU to ensure they had resources in place to help Royan. [Dkt. 135 ¶ 17.] She also informed

---

[6]     Royan argues that Dr. Patel provided "no specific examples" in criticizing Royan's performance, but that is belied by this and other examples in the email. [Dkt. 135 ¶ 16.]

Dr. Patel she was going to schedule a meeting with Royan for March 8, and Royan would not be on-site for the rotation that day. [*Id.*] Dr. Johnson forwarded the email thread to Elmer Gentry—the Program's acting dean—saying she would schedule the meeting with Royan once she heard from CSU police and the Behavioral Assessment and Intervention Team ("BAIT"). [*Id.*; *see also* Dkt. 129 ¶ 3.]

When Royan learned she was to meet with Dr. Johnson instead of going to her rotation with Dr. Patel, she called Dr. Patel to understand why. [Dkt. 135 ¶ 18.] Dr. Patel explained the purpose of the meeting with Dr. Johnson was to discuss her poor performance in the rotation, as well as her mental health. [*Id.*] In a subsequent email to Dr. Johnson, Dr. Patel noted Royan was "upset and crying", but Dr. Patel assured Royan the meeting's purpose was to "better understand [Royan's] perspective" and figure out how to help her succeed. [*Id.*] Royan remembers the call differently. According to her, Dr. Patel said she was concerned Royan was going to hurt herself, and that she would be responsible if Royan did so. [*Id.*]

Drs. Johnson and Bishop met with Royan on Friday, March 8. Afterward, Dr. Johnson sent Royan an email stating the parties discussed Royan's deficits in the rotation regarding "clinical knowledge, inability to counsel patients independently, and need[] [for] improvement to identify/solve drug therapy related problems." [Dkt. 121-3 at 30.] She added that "without significant improvement … you are at risk for failing the" rotation. [*Id.*] Dr. Johnson also reminded Royan of the Program's resources to help students, which was "briefly discussed." [*Id.*] Royan admits these topics were discussed, but contends the focus of the conversation was on her

disability. [Dkt. 135 ¶ 19.] At the end of the meeting, Royan agreed to return to Dr. Patel's rotation the following Monday. [Dkt. 129 ¶ 29.]

Royan's return on March 11 did not go well, although the parties sharply contest what occurred. The one point of agreement is Dr. Patel and Royan went over Royan's "journal club presentation", a major project for the rotation. According to Royan, after ignoring her for 30 minutes, Dr. Patel asked Royan why she came back, and said "I told you not to come back here, I told you that your grade was F." [Dkt. 135 ¶ 21.] She then took Royan's journal club presentation, and harshly critiqued every aspect of it for over an hour, calling it "bullshit." [*Id.* ¶ 22.] Dr. Patel believes she provided Royan with "constructive criticism" on the project, and denies treating Royan with hostility. [Dkt. 129 ¶ 30.]

Royan called Dr. Bishop immediately after Dr. Patel finished. Relaying the substance of the call to Dr. Johnson, Dr. Bishop noted Royan was "in hysterics, crying and audibly upset" over Dr. Patel's remarks on her presentation. [Dkt. 135 ¶ 23.] Dr. Bishop asked Royan if she needed to return to the rotation, and Royan responded "although I am supposed to return to site, I do not want to see [Dr. Patel]. I do not care if I receive a failing grade. I can not go back." [*Id.*] Royan contends Dr. Bishop then told her to leave the site. [*Id.*] An hour later, Dr. Patel emailed Royan asking her to return to the site after her lunch, but Royan did not respond. [Dkt. 129 ¶ 32.]

Later that evening on March 11, Dr. Johnson sent Royan an email saying "I talked with Dr Bishop regarding your experience at site today. Based upon your discussions with Dr Bishop, please don't report to site tomorrow. I will reach out to

you this week so that we can meet and determine the next steps. I have already notified Dr Patel." [Dkt. 127-20 at 1.] Dr. Johnson also reached out to Dr. Patel to get her side of the story, who said it was a "relatively normal" day from her perspective, and she merely provided Royan feedback on how to "fix the missing, yet required components of a journal club." [Dkt. 135 ¶ 24.]

At some point on March 11, Drs. Johnson, Bishop, Patel, and Prusi met to discuss the latest updates with Royan. [*Id.* ¶ 25.] Prusi sent a summary email to the group afterward, where Dr. Patel's concerns regarding Royan's inability to meet substantive rotation expectations and receive feedback were noted. [Dkt. 127-20 at 2.] The email also stated that after Royan said she would not continue with the rotation, the group agreed the "plan is to find an alternative site for the student to complete the [rotational] experience as of 3/12/2019." [*Id.*] Prusi also mentioned "serious concerns about this student's safety and wellbeing" and "requested frequent wellbeing checks from [CSU] to the student if possible." [*Id.*]

The following day proved to be equally eventful. According to Dr. Patel, an anonymous student[7] informed her Royan had threatened self-harm—to "end the life"—if she failed her rotation. [*Id.* ¶ 26.] Royan denies she ever said this. [*Id.*] Dr. Johnson relayed the information to CSU's in-house counsel, who scheduled Royan to meet with the BAIT team on March 14. [*Id.* ¶¶ 28-30.] Royan, who had no knowledge of these conversations and plans, sent an email to Drs. Bishop and Johnson the same day defending her performance in Dr. Patel's rotation. She admitted to some

---

[7] Despite repeated attempts from CSU personnel and Royan's counsel during the discovery process, Dr. Patel has steadfastly refused to disclose the student's name.

mistakes, but said Dr. Patel was overly critical and "she already made up her mind that I shouldn't go to any rotations." [Dkt. 127-22 at 2.] Royan added her "decision to not go back to the [rotation] is not emotional[] because I know myself, I don't quit easily. I made this decision because since Wednesday [March 6] I've been in a very bad place mentally & physically." [*Id.*]

The meeting that was initially set to take place on March 14 occurred on March 21. [Dkt. 135 ¶ 31.] Royan was informed at this meeting she would receive an "F" for her rotation with Dr. Patel; there was no discussion of finding an alternative site for Royan to complete the rotation as contemplated on March 11. The stated reason for the grade was Royan voluntarily left the rotation and refused to return. [Dkt. 129 ¶ 33.] Royan argues the real reason is the Program's fear of liability stemming from her disability, as proven by the unannounced presence of the BAIT team during the meeting, and their intrusive questions regarding her medications and treatment. [*Id.*; *see also* Dkt. 135 ¶ 31.]

### D. Royan is Placed on Academic Probation and Appeals

Once Royan received the "F", the Committee informed her she needed to meet with them to discuss the requirements for her continued participation in the Program. [Dkt. 129 ¶ 33.] This meeting took place on March 26 and was attended by Dr. Johnson, as well as department chairs, faculty members, and the Associate Dean of Academic Affairs. [*Id.* ¶¶ 34-35.] There is no evidence any members of the Committee besides Dr. Johnson were aware of Royan's disability. The Committee also provided Royan with a notice of her academic probation, which explained that to return to good academic standing, Royan must:

> a) repeat successfully an additional Ambulatory Care experience during next academic year [and] b) successfully complete additional remedial work in the following areas–gathering and assessing patient data; evaluating patient-specific drug therapy and therapeutic problems; selecting and recommending a drug therapy plan; monitoring drug therapy; effectively communicating with patients and other healthcare providers; retrieving and evaluating drug information and literature; demonstrating self-learning and self-assessment abilities and habits; and demonstrating professionalism and ethics (HIPAA).

[Dkt. 129 ¶ 36.] The Committee outlined five specific tasks for Royan to complete that would satisfy her remedial work, including taking a six-week clinic and re-taking the rotation she failed with Dr. Patel with another preceptor. [Dkt. 121-3 at 32.]

Royan timely appealed the Committee's decision to place her on probation to Gentry, the Program's Dean, on April 15. [Dkt. 129 ¶ 37.] When she had not heard back within two weeks, Royan emailed Gentry saying she is going through "hell" because of Dr. Patel's evaluation, and the Program "completely ignored all of [Royan's] hard work all these years while being in & out of treatment." [*Id.* ¶ 39.] Gentry responded saying no decision had been made but noted his "concern" she "assumes pre-judgment by all of the parties involved at the University." [*Id.* ¶ 40.]

Gentry met with Royan as part of the appeal process. [Dkt. 135 ¶ 32.] Royan contends during their meeting Gentry told her "because of your health, you're not capable of working as a pharmacist" and the Program was "responsible" if Royan hurt herself. [*Id.*] Gentry denied Royan's appeal on May 10, finding the information Royan submitted with her appeal was "similar" to what the Committee considered when issuing its decision. [Dkt. 129 ¶ 41.]

### E. Royan is Assigned to Dr. Kerner for Remedial Work and Dismissed from the Program

As part of her remedial probation requirements, Royan was assigned to a rotation with Dr. Daniel Kerner starting June 6, 2019. [Dkt. 127-12 at 1.] Dr. Kerner had previously taught Royan, which did not go well from Royan's perspective. Royan got a "C" in the class, and Dr. Kerner told her she would have failed if the class was a rotation. [Dkt. 135 ¶ 33.] Royan immediately protested having to work with Dr. Kerner again to Drs. Johnson and Gentry, to no avail. [*Id.* ¶ 34.] Royan told Dr. Kerner on the first day of the remedial rotation it was "unfair" she had to work with him, and that she wanted to work with someone else. [*Id.*] While Royan does not elaborate on the source of Dr. Kerner's alleged animus towards her, she admits it was not her disability, as Dr. Kerner was never aware of Royan's depression or eating disorder. [Dkt. 129 ¶ 64.]

Dr. Kerner provided Royan with weekly progress reports on her performance in the rotation, outlining both positives and areas needing improvement. [Dkt. 121-3 at 38-44.] The reports were mostly critical, with two main themes: Royan acted unprofessionally (particularly when receiving feedback) and was prone to substantive mistakes and knowledge gaps. [*Id.*]

After receiving one of the reports, Royan responded to Dr. Kerner providing defenses for her actions. This led Dr. McClain, a Program administrator supporting Royan while on probation, to admonish her for arguing with Dr. Kerner, and warned "[i]f this attitude/mindset continues, we will have to have another discussion on what steps are needed to take and you might not be allowed to proceed any further with

your pharmacy career here at Chicago State University." [*Id.* at 39-40.] Royan does not dispute the content of the reports, or that she made mistakes in Dr. Kerner's rotation, but contends Dr. Kerner was not providing objective feedback on Royan's performance given his negative disposition towards her. [Dkt. 129 ¶¶ 44-45, 47.]

Ultimately, Royan failed Dr. Kerner's rotation. This came as a surprise to Royan, who thought she did well on her final presentation, given on July 18. [Dkt. 135 ¶ 36.] The Program summarized the reasons Royan failed as follows:

> Throughout, the entire rotation Ayla constantly missed days and was distracted which disrupted her learning during this rotation. There were multiple instances where outside stressors caused Ayla to become very emotional and frustrated which led her to requesting to leave site early on multiple occasions. Ayla was unable to improve on providing patient care, her clinical knowledge still lacked, could not effectively communicate with other health care providers, and professionalism was a major concern.

[Dkt. 121-15 at 3.] After failing this second rotation, the Committee dismissed Royan from the Program. [Dkt. 129 ¶¶ 48, 65.] This dismissal occurred notwithstanding Royan receiving "A" grades in all her other classes during the Spring 2019 semester, and a letter from another external preceptor, complimenting Royan as being "professional and knowledgeable." [Dkt. 127-6 at 2; Dkt. 127-15.]

Royan appealed her dismissal from the Program through a letter from counsel on August 9, 2019. [Dkt. 127-13.] The appeal rehashed the alleged mistreatment by Dr. Patel, and argued Dr. Kerner was "verbally abusive" to Royan. [*Id.* at 5.] Royan's appeal claims Dr. Kerner told her she failed "because we had an argument and you were not professional." [*Id.* at 6.]

15

Royan sent her appeal to Dr. Gentry, who was the acting dean of the Program at the time. Dr. Gentry forwarded the appeal to CSU's lawyers upon receipt, which is the university's protocol when attorneys are involved. [Dkt. 129 ¶ 68.] On November 13, 2019, CSU's legal department sent Royan's appeal to Matthew Fete, who had replaced Dr. Gentry as the College of Pharmacy's Dean in September 2019. [*Id.* ¶¶ 3, 69.] Dean Fete denied the appeal and Royan's request for reinstatement after finding the Committee followed due process and the Program's policies.[8] [*Id.*; *see also* Dkt. 121-2 at 3, 5.]

This litigation followed. Royan alleges CSU violated the Rehab Act and ADA in dismissing her from the Program, and that Dr. Gentry violated her due process rights under 42 U.S.C.§ 1983 by not timely adjudicating her appeal. Defendants have moved for summary judgment on all claims.

## III.  **Legal Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019).

---

[8]     While not relevant to deciding this motion, it appears the parties disagree as to whether Royan received notice of Dean Fete's written denial.

16

Ultimately, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex*, 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## IV.    Analysis

Royan alleges that CSU intentionally discriminated against her based on her disability in violation of both Section 504 of the Rehab Act and Title II of the ADA.[9]

---

[9]    A plaintiff may establish disability discrimination by showing "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 593 (7th Cir. 2018). Neither the operative complaint nor the parties' briefing explicitly states which theory Royan pursues, but the Court concludes that intentional discrimination is the sole option because Royan did not request an accommodation, and CSU's decision to dismiss Royan impacted only her.

To establish a Rehab Act claim, the plaintiff must satisfy four prima facie elements: "(1) the plaintiff must be a handicapped individual as defined by the Act; (2) the plaintiff must be 'otherwise qualified' for participation in the program; (3) the program must receive federal financial assistance; and (4) the plaintiff must have been denied the benefits of the program solely because of [her] handicap." *Reed v. Columbia St. Mary's Hospital*, 915 F.3d 473, 484 (7th Cir. 2019). For an ADA claim, a plaintiff must show she is a "qualified individual with a disability" who, "by reason of such disability" was "denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132; *see also Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

These causes of action are "functionally identical", *Wagoner*, 778 F.3d at 592, but differ in one salient aspect: "The Rehabilitation Act has a stricter causation requirement: the plaintiff's disability must be the *sole* reason for the alleged discriminatory action; this contrasts with the ADA, which requires only that the plaintiff's disability be *a* reason for the challenged action."[10] *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021) (emphases in original); *Reed*, 915 F.3d 473 at 484 ("The ADA and the Rehabilitation Act are otherwise very similar, but the Rehabilitation Act prohibits discrimination only if it is 'solely by reason of' a person's

---

[10]     Royan argues the Rehab Act requires only "but-for" causation. [Dkt. 127 at 15.] But the cases she cites omit the causation nuance between the statutes, and applies the more lenient "but-for" standard in dismissing both a Rehab Act and ADA claim. *See A.H.*, 881 F.3d 587; *H.P. v. Naperville Cmty. Unit Sch. Dist.*, 910 F.3d 957 (7th Cir. 2018). The more recent Seventh Circuit caselaw cited by the Court—in addition to the statutes' plain language—establish the disability itself must be the sole cause of injury in a Rehab Act claim.

18

disability. The ADA permits mixed-motive claims"); *see also Swain v. Wormuth*, 41 F.4th 892, 899, n.4 (7th Cir. 2022).

Consequently, Royan's Rehab Act claim can only survive if her disability was the sole reason she was dismissed from the Program, whereas her ADA claim merely requires the disability to be a "but-for" cause of the dismissal. *See Kurtzhals v. Cty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020).

Defendants argue Royan's disability claims fail for two reasons. First, the Program's decision to dismiss Royan was not solely based on her disability. [Dkt. 120 at 10-12.] Second, Royan was not "otherwise qualified" to participate in the Program because of her poor academic performance. [*Id.* at 12-13.] Finally, Gentry contends he did not violate Royan's constitutional rights because he was replaced as dean of the Program shortly after her appeal.

## A.    Rehab Act: Solely Based on Disability

CSU argues summary judgment is proper because Royan cannot show her dismissal from the Program was solely based on her disability. [Dkt. 120 at 10-11.] As explained above, this argument can only defeat Royan's Rehab Act claim. The Court determines it does.

The Committee's decision to dismiss Royan from the Program occurred after she failed her rotations with Dr. Patel and Dr. Kerner. In contrast to Dr. Patel, Dr. Kerner was unaware Royan suffered from depression or an eating disorder; he did not know Royan was disabled. [Dkt. 129 ¶ 64.] If Dr. Kerner was ignorant of Royan's disability, then he could not have failed her on account of her disability. *See Suprling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (it is a "well-established

principle that an employee cannot hold an employer liable under the ADA if the employer has no knowledge of the employee's disability"); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1996).

Royan contends Dr. Kerner was "hostile" and a "previous tormentor" of hers, [Dkt. 127 at 13-14], but even taken as true, she admitted in her deposition he did not know she was diagnosed with depression or an eating disorder.[11] [Dkt. 129 ¶ 64.] In addition, Dr. Kerner provided weekly progress reports on Royan's performance showing that she was not meeting course expectations in several key respects, including professionalism and substantive knowledge. [Dkt. 121-3 at 38-44.] Royan argues without support there "was no need" for the Program to place her in a rotation with Dr. Kerner, but the Committee is tasked with deciding what actions a student placed on academic probation must take to return to good standing, including remedial course work. [Dkt. 129 ¶ 5.] Moreover, the Program requires students to pass their rotations to satisfy graduation requirements. [*Id.* ¶ 2.]

Royan also suggests the Committee purposefully scheduled Dr. Kerner to teach her remedial rotation, ostensibly with the foresight and intention she would not pass his rotation. [Dkt. 127 at 14-15.] But she provides no evidence to support the notion the Committee knew of Royan's "history" with Dr. Kerner, nor that they intentionally selected Dr. Kerner because they believed he would fail her. Royan has raised nothing

---

[11] Royan's evidence of Dr. Kerner's "hostility" is suspect. She claims that Dr. Kerner was the only instructor prior to Dr. Patel who threatened to fail her, [Dkt. 135 ¶ 33], but that does not suggest animus. She also argues Dr. Kerner made inappropriate remarks that led to disagreements between the two, [*Id.* ¶ 35], but standing alone, that cannot support a finding of discrimination based on Royan's disability.

more than a "metaphysical doubt", which is insufficient at summary judgment. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. 574, at 586.

No reasonable jury could find Royan's dismissal from the Program was solely based on her disability. CSU's motion for summary judgment is therefore granted as to Royan's Rehab Act claim. *Swain*, 41 F.4th 899 at 899-900.

### B.    ADA and Rehab Act: Qualified Individual

CSU next argues Royan cannot establish a *prima facie* ADA claim because she is not a "qualified individual."[12] [Dkt. 120 at 12-13.] "In the context of a university, a person is 'otherwise qualified' if she is able to meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation." *Khan v. Midwestern Univ.*, 879 F.3d 838, 844 (7th Cir. 2018) (citing *Knapp v. Nw. Univ.*, 101 F.3d 473, 482 (7th Cir. 1996)). "Academic decisions, such as whether a student is qualified for, or entitled to promotion within a program, must be left to the broad discretion of the academic institution." *Id.* The Court cannot "override" a university's decision on a student's qualification "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

CSU argues Royan was not "otherwise qualified" to remain in the Program because she did not meet its academic requirements. More specifically, CSU contends Royan failed her rotation with Dr. Patel after she refused to return following the

---

[12]    While Defendants raise this argument under the ADA only, it equally applies to Royan's Rehab Act claim, serving as another basis for summary judgment.

journal club meeting, leading the Committee to place her on academic probation. [Dkt. 120 at 12.] Then Royan failed to satisfy the remedial requirements of her probation when she failed Dr. Kerner's rotation, who was unaware of her disability. Prior to failing each rotation, Royan's preceptors extensively critiqued her substantive knowledge, professionalism, and ability to meet course expectations. Based on these deficiencies, the Committee dismissed Royan pursuant to procedures prescribed in the Program's handbook. [*Id.*]

Despite her recognition that being "otherwise qualified" is a prerequisite to establishing her disability claims, Royan does not specifically respond to this argument. Instead, she points to certain incidents with Dr. Patel, as well as her strong grades in other courses. [Dkt. 127 at 15-16.] But passing many courses does not entitle Royan to continue in the Program when she failed others. *Khan*, 879 F.3d at 845 (rejecting argument that student was otherwise qualified under the Rehab Acy "because she had passed several classes" where student also failed several courses in violation of program requirements).

As to Dr. Patel, Royan ignores the fact that the Committee—which neither Dr. Patel nor Dr. Kerner were on—met twice to determine what discipline Royan would receive for her failing grades. They elected to place Royan on probation, provided her with clear instructions for what she needed to do to return to good standing, and then ultimately dismissed her once she received the "F" in Dr. Kerner's rotation.[13] This

---

[13]    Royan's contention she believes she deserved to pass Dr. Kerner's rotation is unavailing, where, as here there "is no evidence that the faculty member's grading … was anything other than an honest, professional evaluation of" the student's work. *Novak v. Bd. of Trs.*, 777 F.3d 966, 977 (7th Cir. 2015).

decision is "left to the broad discretion of the academic institution" that a Court must respect unless Royan can put forth evidence showing the Committee's decision was "such a substantial departure from academic norms" that it "did not actually exercise professional judgment." *Khan*, 879 F.3d 838 at 844.

Royan has provided no such evidence; at least not in a coherent legal argument. Royan's response brief devotes less than three full pages to her argument, compared to roughly 12 pages of facts—a substantial portion of which is dedicated to arguing for an erroneous causation standard in Rehab Act cases.[14] [*See* Dkt. 127.] Instead of applying the law, Royan has opted to generally refer the Court "to the facts set out above", which purportedly show "that hostility, even bigotry against [Royan] for a medical condition, shared by many, was the reason for her dismissal." [*Id.* at 15.]

But it is not the Court's role to take facts supplied by the parties and transform them into compelling legal bases to defeat summary judgment. *Lane v. Structural Iron Workers Local*, 74 F.4th 445, 452–53 (7th Cir. 2023) (counsel are "best positioned and best motivated to provide more information in support of his claim"); *Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006) ("Underinclusive and skeletal presentations impermissibly shift the responsibility to the court to do the lawyer's work and to explicate the arguments that the briefs have left undeveloped … and the Seventh Circuit has stressed time and again that it is not a judge's responsibility to research and construct the parties' arguments.")

---

[14]     The Court appreciates its standing order sets a 15-page limit for briefs, but it also routinely grants requests for additional pages when warranted.

To the extent Royan addresses whether she was "otherwise qualified" for the Program, her argument appears to be that her performance prior to Dr. Patel's rotation proves she was, but CSU used various pretexts to dismiss her. [*See* Dkt. 127 at 15 ("Of course, there are vague non-specific claims of academic deficiencies, but these are not likely to be credited by a jury"); *id.* at 16 ("any other reason given [for Royan's dismissal] has to be legitimate and not a pretext.").] Entirely missing from this argument is any explanation of how pretext applies to the facts of this case. It is neither appropriate nor permissible for the Court to guess at Royan's argument on this score, *Lane*, 74 F.4th 445, at 452–53, and Royan's decision to not engage with the law is reason enough to grant summary judgment. *Rahn v. Bd. of Trs. of N. Ill. Univ.*, 803 F.3d 285, 295 (7th Cir. 2015) (a party who fails "to cite any legal authority in support of their argument" waives it).

Even assuming Royan could establish she is otherwise qualified, Royan would fall short of the pretext mark. Pretext in this context "means a phony reason for some action" where the inquiry is not whether the Committee's decision "was inaccurate or unfair, but whether [it] honestly believed the reasons it has offered to explain the discharge." *Novak*, 777 F.3d 966, at 976. Royan has simply not argued—let alone submitted evidence showing—the Committee did not believe its stated reasons for dismissing Royan. Indeed, Royan has not even supplied the Court with basic information such as who is on the Committee. Consequently, she cannot show the Committee did not subjectively believe in its decision.

The evidence that has been supplied indicates the Committee had ample bases to legitimately find Royan was not suitable to continue in the Program. Both Dr. Patel and Dr. Kerner documented their strong critiques of Royan's substantive knowledge and professionalism. And while there is some dispute over the circumstances surrounding Royan's departure from Dr. Patel's rotation, Royan herself framed the decision as her own:

> At this point I know Im not going to learn anything from Dr. Patel anymore. I know she already made up her mind that I shouldn't go to any rotations. *My decision* to not go back to the site is not emotionally because I know myself, I don't quit easily. *I made this decision* because since Wednesday Ive been in a very bad place mentally & physically even though, I started fresh on Monday & thanked her for giving me another chance. But if a preceptor who barely has spent 30 minutes with me in a day during these 4 weeks suddenly spend 2.5 hours criticizing me, questioning my intelligence, and make me feel stupid in a very unprofessional way, obviously is not willing to teach me anything more.

[Dkt. 127-22 at 2 (emphases added).] These facts undercut any argument the Committee was lying about why it decided to dismiss Royan.[15] For all these reasons, summary judgment is proper on Royan's ADA and Rehab Act claims.

## C.    42 U.S.C. § 1983: Gentry and Due Process

Royan's final claim is against Gentry for allegedly depriving her of Due Process in violation of 42 U.S.C. § 1983 based on his handling of her appeal from dismissal. To recover under Section 1983, a plaintiff must establish that the constitutional

---

[15]    The notion the Committee's reason was a "phony reason" is made all the more untenable because the Program accommodated Royan's disabilities time and again throughout her career. [Dkt. 129 ¶¶ 10-14.] It strains credulity to suggest the Program went from helping Royan manage her disability to orchestrating a conspiracy to dismiss her based on that disability because of one non-Program preceptor. *See Novak*, 777 F.3d at 975 ("Any inference of discriminatory intent would be unreasonable in light of the undisputed evidence that the University repeatedly had accommodated his PTSD.")

violation itself was the cause-in-fact and proximate cause of her harm. Put differently, the plaintiff must show "the injury would not have occurred absent the conduct." *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Royan cannot establish this requirement.

Royan appealed her dismissal in a letter submitted by counsel on August 9, 2019. [Dkt. 127-13.] Gentry was the Program's dean at the time, and pursuant to the student's handbook, the dean was responsible for resolving appeals. [Dkt. 129 ¶ 6.] The handbook does not list a deadline for when the dean must rule on the appeal. Gentry forwarded Royan's appeal to CSU's legal counsel, and was eventually replaced as dean by Matthew Fete in September 2019, eliminating Gentry's obligation to act on Royan's appeal.

Royan's Section 1983 claims against Gentry must fail for three related and straightforward reasons: (1) Gentry was no longer responsible for adjudicating Royan's appeal when Fete took over as the Program's Dean in September 2019; (2) Gentry had no obligation to issue a ruling on Royan's appeal while he was dean; and (3) Gentry did not deny Royan's appeal. *See e.g., Locke v. Haessig*, 788 F.3d 662, 668 (7th Cir. 2015) (a defendant can only be held liable "for his or her own misconduct" in Section 1983 cases).

Royan's arguments in response—which contains no legal citations and cover scarcely a quarter of one page—are that Gentry "made the original decision to hold up the appeal", "did not care about" the appeal, and he told Royan she was too sick to be a pharmacist. [Dkt. 127 at 16.] None of these statements support a conclusion that

26

Gentry violated Royan's due process in the three weeks he was responsible for her appeal. Rather, the undisputed record shows Gentry promptly acted on her appeal by sending it to legal counsel. To the extent any party caused Royan to suffer a due process violation, it was not Gentry, and summary judgment is therefore proper. *Whitlock*, 682 F.3d 567 at 582; *see also Carter v. Baldwin*, 2018 WL 656086, at *4 (N.D. Ill. Feb. 1, 2018) ("To be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right.")

## V.    Conclusion

The Court acknowledges the difficulty of Royan's position. Having advanced so far in pursuit of her degree—incurring considerable expense in the process—only to fall short of matriculation is an immense hardship. But Royan has not shown that there are triable issues of fact on any of her claims. Defendants' motion for summary judgment is granted.

Enter: 20 CV 2014
Date:  April 5, 2024

_____
Lindsay C. Jenkins
United States District Judge

27